# In the Matter Of:

## DEROKEY vs HAZA FOODS OF LOUISIANA

18-4942

## PATTY PAULIN

*October 26, 2018*



ESQUIRE DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF LOUISIANA
 3   KIRK A. DEROKEY                      )
 4                   Plaintiff,           )
 5        -vs-                            )    Civil Action
 6   HAZA FOODS OF LOUISIANA, LLC,        )    No. 18-4942
 7   and TRAVELERS INSURANCE              )
 8   COMPANY,                             )
 9                   Defendant.           )
10
11            The deposition of PATTY PAULIN, called
12   for examination, taken pursuant to the Federal Rules
13   of Civil Procedure of the United States District
14   Courts pertaining to the taking of depositions,
15   taken before ANNE E. FOGARTY, a Notary Public within
16   and for the County of Cook, State of Illinois, and a
17   Certified Shorthand Reporter, CSR No. 84-3870, of
18   said state, at Suite 1180, 980 North Michigan
19   Avenue, Chicago, Illinois, on the 26th day of
20   October, A.D. 2018, at 8:55 a.m.
21
22
23
24
```



```
 1  PRESENT:
 2          LeBLANC FANTACI VILLIO, LLC,
 3          (3421 North Causeway Boulevard, Suite 201,
 4          Metairie, Louisiana 70002,
 5          504-828-1010), by:
 6      MS. DEBORAH A. VILLIO,
 7      dvillio@lfvlaw.us,
 8              appeared on behalf of the Plaintiff;
 9
10          LEAKE & ANDERSSON, LLP,
11          (1100 Poydras Street, Suite 1700,
12          New Orleans, Louisiana 70163,
13          504-585-7500), by:
14      MR. DEAN M. ARRUEBARRENA,
15      darreubarrena@leakeandersson.com,
16              appeared on behalf of the Defendant.
17
18
19
20
21
22
23  REPORTED BY:  ANNE E. FOGARTY, CSR No. 84-3870.
24
```



1   A.   That is correct.
2   Q.   Was it part of your responsibilities to
3   ensure that that information was provided?
4   A.   Yes.
5   Q.   Now, you indicated that this report came
6   to you from the restaurant's e-mail.  Would that
7   have come to you by way of an attachment to your
8   e-mail address, the report was an attachment to your
9   e-mail address?
10  A.   Yes.  It should come to my e-mail.
11  Q.   So if I am correct, I believe your
12  e-mail is ppaulin@gulshaninc.com?
13  A.   Yes.
14  Q.   So whoever would have sent this incident
15  report to you, if I'm understanding you correctly,
16  would have prepared an e-mail to Patty Paulin and
17  attached the report to that e-mail and that's how
18  you would have received it, correct?
19  A.   Yes.
20  Q.   And you indicated that was about within
21  a week, give or take, of the incident, correct?
22  A.   Yes.
23  Q.   So in terms of your record retention,
24  are your e-mails still available, the e-mail that



```
 1  would have been sent to you that attached this
 2  report?
 3       A.    I don't believe that they -- I don't
 4  believe that it still is.
 5       Q.    Why do you believe that it's not still
 6  available?
 7       A.    Because last January my computer crashed
 8  and I lost quite a bit of information.
 9       Q.    What about -- I'm assuming it's a server
10  for the corporation, though, correct, not just your
11  computer, correct?
12       A.    Correct.
13       Q.    So that wasn't a personal e-mail
14  address, that was an e-mail address for the
15  business?
16       A.    Correct.
17       Q.    And it is your testimony that you don't
18  remember who from the restaurant actually sent
19  you --
20       A.    I do not remember.
21       Q.    -- the e-mail?
22             Is this the first claim that you've ever
23  handled for that restaurant?
24       A.    No.
```



```
 1  information about the incident.  So my question to
 2  you is who did you speak with and what did they tell
 3  you?
 4       A.    I don't remember.  I remember I was told
 5  somebody fell in the restroom.
 6       Q.    And when you were told someone fell in
 7  the restroom, as the claims handler is there
 8  somewhere you would have documented that information
 9  in your notes?
10       A.    Yes.
11       Q.    And did you document that information in
12  your notes?
13       A.    Yes.
14       Q.    Have you provided those notes relative
15  to those discussions?  Have you provided those notes
16  to Mr. ARRUEBARRENA?
17       A.    I believe he has the original notes from
18  my documentation of my conversation with the
19  restaurant.
20       Q.    And that conversation took place --
21  that's the first conversation that took place within
22  about a week of the fall?
23       A.    Actually, it was about a month after the
24  fall that I spoke with the restaurant.
```



1  Wendy's manager said that this person fell over the
2  wet floor sign, but Kirk, the customer, said it was
3  inside the restroom."
4           Tell me about that note.  First of all,
5  you indicated Kim was an adjustor with Travelers?
6       A.   Uh-huh.
7       Q.   Tell me what information you learned
8  about the leak in the bathroom.
9       A.   Okay.  So when I -- before I wrote to
10 Kim, I called the restaurant and asked them if they
11 had any information regarding the fall in the
12 restroom.  But what I said, I said do you know --
13 can we talk about the fall, the recent incident.
14 And then -- it was a woman, but I don't remember her
15 name.  She said, oh, yeah, that was fixed like three
16 days after.
17      Q.   Okay.
18      A.   So I thought, okay, there was a repair
19 done?  I felt that, you know, maybe -- you know, I
20 was going off what he told me.  Yeah, there was --
21 you know, there was an incident with there was water
22 on the floor.  But I remember Mr. Derokey saying
23 something that he had overheard someone say there
24 was a leak.  So I just assumed, okay, there was some



1  kind of bathroom, maybe it was the sink.  I don't
2  really know why I put sink because he didn't tell me
3  sink.
4           But then when I spoke with one of the
5  managers at the restaurant and I said what was --
6  when I said let's talk about the fall, I believe
7  they either got confused with my question, because
8  three days after Mr. Derokey had fallen there was
9  another person that fell outside the drink station
10 where there was a leak and a repair that needed to
11 be done.
12      Q.  So help me with something, Ms. Paulin.
13 What are you trying to tell me about the leak?  Are
14 you telling me there was no leak and that your notes
15 are mistaken?  I don't understand the explanation
16 you're giving me.
17      A.  I asked can we talk about -- do they
18 know anything about a fall and a leak.  And I
19 believe that the manager that I spoke with was
20 talking about the case that I had three days later,
21 the Marine case.  Because there was a fall where
22 there was a leak by the fountain station.
23      Q.  We're going to get to that.  But why is
24 it today you don't -- let's be honest, Ms. Paulin,



1  don't have a lot of memory about anything. So why
2  is it that you believe somehow today that they must
3  have been confused about that conversation back on
4  May 18, 2017?
5      MR. ARRUEBARRENA: I'll object to the form of
6  the question. And also object that it has been
7  asked and answered, but I'll let her answer.
8      MS. VILLIO: Sure.
9  BY MS. VILLIO:
10     Q.  Why is it today it's your testimony that
11 you believe somehow they were confused?
12     A.  Because those are the two incidents that
13 happened within a week, which is very rare that
14 you're going to get two incidents with liquid on the
15 floor. And the only one that I -- that I saw that
16 there was a repair on was the leak outside by the
17 fountain.
18     Q.  That's just information that you've come
19 upon recently?
20     A.  No. No. I want to say after the Marine
21 case was investigated then I kind of put two and two
22 together. Like, okay, there was information about a
23 repair by the drink station, but there was nothing
24 about any kind of repair in the restroom.



800.211.DEPO (3376)
EsquireSolutions.com

1    Q.   Let me ask you this:  If the privilege
2 log referred to some of your notes as red flags -- I
3 believe you used the term "red flag" today?
4    A.   I did.
5    Q.   Tell me specifically again what it was
6 that you believed raised red flags in Mr. Derokey's
7 incident?
8    A.   Okay.  No. 1, because he fell in the
9 restroom, so I know that it wasn't seen by anyone.
10 He told me it wasn't seen by anyone.
11   Q.   Okay.
12   A.   The fact that he fell on a wet floor
13 sign.  I wondered why there was a wet floor sign.
14 And the fact that he said there was water on the
15 floor.  And when he stated his injuries.  So I was
16 concerned.
17   Q.   Have you seen his medical records?
18   A.   No.
19   Q.   So you're just concerned because he
20 stated he was injured and that was a red flag to
21 you?
22   A.   Well, no.  He said that he hurt his
23 back, and I believe it was his arm.  But he had
24 mentioned that he hurt himself and needed medical

